UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCO GARAY,<br>    Plaintiff,<br>v.<br>SOUTHWEST AIRLINES CO.,<br>    Defendant. | Case No. 19-cv-05452-PJH<br><br>**ORDER GRANTING PLAINTIFF'S MOTION TO REMAND**<br>Re: Dkt. No. 13 |

Before the court is plaintiff Marco Garay's ("plaintiff") motion to remand. Dkt.13. The matter is fully briefed and suitable for decision without oral argument. Having read the parties' papers and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS plaintiff's motion for the following reasons.

**BACKGROUND**

On October 25, 2018, plaintiff filed his complaint alleging a putative employment-related class action against defendant Southwest Airlines Co. ("defendant") in Alameda county. Dkt. 1, Ex. A (Compl.). Based on that complaint, defendant removed plaintiff's action to this court on December 14, 2018, thereby giving rise to the related case Garay v. Southwest Airlines Co., 18-cv-07538-PJH ("Southwest I"). On February 28, 2019, this court granted plaintiff's first motion to remand. Southwest I, Dkt. 17.

Defendant filed its second notice of removal of plaintiff's action to this court on August 29, 2019. Dkt. 1. Defendant bases its subsequent removal on the same complaint and expressly acknowledges that "no further process, pleadings, or orders related to this case have been filed in the Superior Court action or served by any party."

Id. ¶ 9. On September 28, 2019, plaintiff filed the instant motion to remand challenging defendant's subsequent notice of removal. Dkt. 13.

### A. The Complaint

In his complaint, plaintiff alleges six claims on behalf of all persons employed by defendant in California four years prior to plaintiff's action. Compl. ¶ 11. Such claims include the following:

1. Failure to provide meal periods, Compl. ¶¶ 37-52;
2. Failure to provide rest periods, id. ¶¶ 53-63;
3. Failure to pay hourly and overtime wages, id. ¶¶ 64-92;
4. Failure to provide accurate written wage statements, id. ¶¶ 93-99;
5. Failure to timely pay all final wages ("waiting time penalties"), id. ¶¶ 100-110; and
6. Unfair competition (Cal. Bus. & Prof. Code §17200), id. ¶¶ 111-127.

In his complaint, plaintiff does not specify the amount in damages sought.

### B. Procedural Posture

#### 1. Southwest I

In support of its first removal, defendant asserted federal jurisdiction under CAFA, as well as Title 28 U.S.C. §§ 1332(d), 1441(a) and 1446. Southwest I, Dkt. 1. Plaintiff subsequently moved to remand the action to Alameda County Superior Court. The parties disputed only whether defendant satisfied its burden of showing CAFA's $5 million amount in controversy requirement had been met. Southwest I, Dkt. 17 (February 28, 2019 Order Remanding Action) at 2. To do so, defendant relied only on plaintiff's second through fifth claims. Id. Defendant ultimately contended that, based on those four claims (plus attorneys' fees), the amount in controversy totaled $134 million. Id.

As evidentiary support for that contention, defendant offered only the declaration of Senior Manager of Engagement and Administration Michelle Inlow ("Inlow"). Southwest I, Dkt. 1-2. As further shown below, a description of this declaration is significant. In her declaration, Inlow provided only the following concerning the amount in

controversy:

- Defendant employed approximately 2,475 individuals as hourly, nonexempt employees in California at any given time in 2014. Such employees had an average hourly rate of $22.12. Dkt. 1-2 ¶ 4;
- Defendant employed approximately 2,704 hourly, nonexempt employees in California at any given time in 2015. Such employees had an average hourly rate of $21.45. Id.;
- Defendant employed approximately 3,003 hourly, nonexempt employees in California at any given time in 2016. Such employees had an average hourly rate of $22.55. Id.;
- Defendant employed approximately 3,254 hourly, nonexempt employees in California at any given time in 2017. Such employees had an average hourly rate of $22.29. Id.;
- Defendant employed approximately 3,667 hourly, nonexempt employees in California at any given time in 2018. Such employees had an average hourly rate of $22.11. Id.;
- Full-time, hourly nonexempt employees are generally scheduled to work five eight-hour shifts per week. Id. ¶ 5;

Inlow further testified that "[i]n general, [defendant's] hourly, nonexempt employees work at least some overtime. Nonexempt, hourly employees in California worked, on average about 3.7 hours of overtime per workweek in 2015, 3.0 hours of overtime per workweek in 2016, 3.4 hours of overtime per workweek in 2017, and 2.7 hours of overtime per workweek in 2018." Southwest I, Dkt. 1-2 ¶ 6. Inlow further provided that defendant pays its nonexempt, hourly employees in California "twice per month, resulting in 24 wage statements per year." Id. ¶ 7.

Lastly, Inlow testified that "[a]pproximately 907 nonexempt, hourly employees in California separated employment from [defendant] between October 25, 2015 and December 31, 2016 [sic], 233 employees in 2016, 284 in 2017, and 348 between January

3

1, 2018 and November 12, 2018." Southwest I, Dkt. 1-2 ¶ 8. Defendant did not offer any additional evidence concerning such facts.

In its February 28, 2019 remand order, the court found that defendant failed to satisfy its burden of showing by a preponderance of the evidence that the amount in controversy for the claims alleged in the complaint exceeded $5 million. Southwest I, Dkt. 17. The court critiqued defendant's amount in controversy conclusion on the ground that it unreasonably assumed a 100 percent violation rate and failed to provide any evidence in support of such assumed rate. Id. at 2. Significantly, the court characterized Inlow's declaration as "do[ing] nothing to show how frequently the alleged violations occurred," and providing that, for example, the fact "that putative class members may have been eligible to receive rest periods does not provide any evidence about whether or how often the defendant failed to provide rest periods." Id. at 3. The court noted that the fact that class members received 24 wage statements per year says "nothing" about "how often" those statements were inaccurate, id., and pointed out that "evidence about the average number of overtime hours worked by putative class members does not show how often, if at all, [defendant] failed to pay overtime wages due," id. at 3-4.

### 2. **Southwest II**

In support of its second removal, defendant again asserted federal jurisdiction under CAFA, as well as Title 28 U.S.C. §§ 1332(d), 1441(a), and 1446. Dkt. 1. Defendant claims that it discovered that this action is removable "based on its own investigation." Id. ¶ 11.

To show satisfaction of the $5 million amount in controversy requirement, defendant relies on the complaint's third claim (failure to pay hourly and overtime wages), fourth claim (failure to provide accurate wage statements), and fifth claim (waiting time penalties). Defendant ultimately contends that the amount in controversy totals $26 million (including attorneys' fees) for this claim alone. Id. ¶ 38. In support of such contention, defendant again relies upon two declarations provided by Inlow—Dkt. 2 (Inlow Declaration In Support of Second Notice of Removal ("Inlow Second Declaration")

4

and Dkt. 15-2 (Inlow Supplemental Declaration In Opposition to Motion to Remand ("Inlow Third Declaration")). Aside from Inlow's declarations, defendant offers no further evidence in support of its amount in controversy contention. As summarized by claim below, both of Inlow's latter two declarations offer more detail and specification on the employment related information at issue than that provided in her first declaration.

With respect to the third claim, defendant relies upon two apparent theories advanced in the complaint: (1) plaintiff's purported "double-shift" theory, whereby defendant failed to pay an overtime premium (i.e., amount in addition to straight hourly pay), Compl. ¶¶ 27-29; and (2) plaintiff's purported "shift differential" theory, whereby defendant failed to factor in certain "shift differential" or "non-discretionary" bonuses to members' regular rate of pay when calculating overtime wages, id. ¶¶ 30-31.

With respect to the double-shift theory, Inlow testifies that "when [defendant's] non-exempt, hourly employees in California voluntarily traded shifts with other employees pursuant to applicable policies, it did not pay overtime premium for those hours worked in the traded shift, even if such hours resulted in the employee working more than 8 hours in a day." Dkt. 2 ¶ 2. With respect to the shift-differential theory, defendant "admits" that it paid putative class members "shift premiums" if they were required to work shifts outside their regular schedule, and that it did not factor such premiums in the regular rate of pay for overtime purposes. Dkt. 1 ¶ 23 citing Dkt. 2 ¶ 3.

Based on her personal knowledge, Dkt. 2 ¶ 1, and role as manager responsible for commissioning defendant's Technology Department to conduct a deeper investigation, Dkt. 15-2 ¶¶ 1, 6, Inlow further testifies to the following overtime compensation related statistics:

- Between October 25, 2014 and December 31, 2014, putative class members worked 46,491.7 hours beyond eight hours in a day for which they were paid at their regular rate of pay without an overtime premium, Dkt. 2 ¶ 4 (emphasis added);
- In 2015, putative class members worked 256,735.8 of such hours, id. ¶ 5;

5

- In 2016, putative class members worked 285,902.7 of such hours, id. ¶ 6;
- In 2017, putative class members worked 311,038.2 of such hours, id. ¶ 7;
- In 2018, putative class members worked 370,502.9 of such hours, id. ¶ 8; and
- Between January 1, 2019 and March 31, 2019, putative class members worked 101,408.2 of such hours, id. ¶ 9.

Using the above information, defendant concluded that the amount in controversy from plaintiff's third claim (under the double-shift theory) amounted to $14 million. Defendants failed to draw any conclusion about the amount in controversy under plaintiff's purported "shift differential" theory.

With respect to the fourth claim, Inlow testifies that "between October 25, 2017 and March 31, 2019, 5,670 putative class members worked a combined 43,290 pay periods during which they either worked more than 8 hours in a day for which they were paid straight time and no overtime premium and/or they were paid a shift premium and worked at least some overtime during the pay period during which the shift period was earned." Dkt. 2 ¶ 10. On the basis of this statement, defendant contends that the fourth claim puts an additional $4 million in controversy.

With respect to the fifth claim, Inlow testifies that "[t]here are 617 putative class members who have separated their employment from [defendant] and either worked more than 8 hours in one day since October 25, 2017 [sic] for which they were paid straight time and no overtime premium and/or were paid a shift premium and worked some overtime for the period during which the shift premium was earned in a pay period since October 25, 2015." Dkt. 2 ¶ 11. On the basis of this statement, defendant contends that the fifth claim puts an additional $3.1 million in controversy.

Plaintiff does not contest defendant's evidentiary showing concerning the satisfaction of the $5 million amount in controversy requirement. Instead, as discussed below, the core of the parties' dispute is whether the facts testified to by Inlow in her latter two declarations qualify as newly discovered evidence justifying a successive removal.

**DISCUSSION**

**A. Legal Standard**

"A motion to remand is the proper procedure for challenging removal." Moore-Thomas v. Alaska Airlines, Inc., 553 F.3d 1241, 1244 (9th Cir. 2009). A federal court properly remands an action to state court when it either lacks subject matter jurisdiction over such action or there is a defect in removal procedure. Allen v. UtiliQuest, LLC, 2014 WL 94337, at *2 (N.D. Cal. Jan. 9, 2014) ("A remand may be ordered either for lack of subject matter jurisdiction or for any defect in the removal procedure.").

As a general matter, a defendant may remove a civil action if a federal district court would have original jurisdiction over the action. 28 U.S.C. § 1441(a). Title 28 U.S.C. § 1453 (the Class Actions Fairness Act ("CAFA")) vests district courts with jurisdiction over a civil class action if the following conditions are satisfied:

1. The matter in controversy exceeds $5 million;
2. The proposed class consists of more than 100 members; and
3. Any member of the proposed class is a citizen of a state different from any defendant.

Reyes v. Dollar Tree Stores, Inc., 781 F.3d 1185, 1188 (9th Cir. 2015) citing 28 U.S.C. §1332(d).

The Supreme Court has clarified that, despite the possible existence of a general presumption against federal jurisdiction "in run-of-the-mill diversity cases, no antiremoval presumption attends cases invoking CAFA." Arias v. Residence Inn by Marriott, 936 F.3d 920, 922 (9th Cir. 2019) (citation omitted).

As a procedural matter, a defendant initiates the removal process by filing a notice of removal in the appropriate district court, 28 U.S.C. § 1446(a), and giving notice to the adverse parties and the state court, 28 U.S.C. § 1446(d). The filing of a copy of the notice in state court "effect[s] the removal and the State court shall proceed no further unless and until the case is remanded." 28 U.S.C. § 1446(d).

Generally, a defendant must remove a case within 30 days of receiving the

complaint. 28 U.S.C. § 1446(b)(1). However, if the complaint itself does not provide a basis for removal, a defendant may file a notice of removal "within 30 days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." 28 U.S.C. § 1446(b)(3). For purpose of Title 28 U.S.C. § 1446(b)(3), "other paper" includes "information relating to the amount in controversy in the record of the State proceeding or in responses to discovery." 28 U.S.C. § 1446(c)(3)(a).

Such notice need include only a plausible allegation that "the amount in controversy exceeds the jurisdictional threshold and need not contain evidentiary submissions." Fritsch v. Swift Transportation Co. of Arizona, LLC, 899 F.3d 785, 788 (9th Cir. 2018). Unless clear from the face of the complaint, "the defendant seeking removal bears the burden to show by a preponderance of the evidence that the aggregate amount in controversy exceeds $5 million when federal jurisdiction is challenged." Ibarra v. Manheim Invs., Inc., 775 F.3d 1193, 1197 (9th Cir. 2015). "The amount in controversy is simply an estimate of the total amount in dispute, not a prospective assessment of defendant's liability . . . In that sense, the amount in controversy reflects the *maximum* recovery the plaintiff could reasonably recover." Arias, 936 F.3d at 927 (emphasis in the original). Subsequently, "if the district court decides that a removed case does not satisfy the requirements for removal, the court must remand the action to state court." Fritsch, 899 F.3d at 789.

**B.     Defendant's Subsequent Removal Is Improper**

As a general matter, a defendant may not subsequently remove an action to federal court. Fritsch, 899 F.3d at 789 ("After a remand, the defendant may generally not remove the case a second time."). Still, a defendant may file a second removal petition when subsequent pleadings or events reveal a new and different ground for removal. Fritsch, 899 F.3d at 789; Reyes, 781 F.3d at 1188 ("A successive removal petition is permitted only upon a 'relevant change of circumstances'—that is, 'when subsequent

8

pleadings or events reveal a *new* and *different* ground for removal.'") (emphasis in the original); Kirkbride v. Cont'l Cas. Co., 933 F.2d 729, 732 (9th Cir. 1991) ("Moreover . . . a relevant change of circumstances will justify reconsideration of a successive, good faith petition for removal. . . . [A] defendant who fails in an attempt to remove on the initial pleadings can file a removal petition when subsequent pleadings or events reveal a *new* and *different* ground for removal.") (emphasis in the original).

The Ninth Circuit has recognized that such "new and different" grounds for removal include the following circumstances: (1) a "change in law" giving rise to a basis for subject matter jurisdiction, Fritsch, 899 F.3d at 789 ("An intervening change in the law that gives rise to a new basis for subject-matter jurisdiction" qualifies as a subsequent event that justifies a successive removal petition."); and (2) a subsequent order by a state court certifying a class broader than that apparently disclaimed by a named plaintiff to the federal court prior to removal, Reyes, 781 F.3d at 1189 ("Of course, defendants are not entitled to more than one bite at the apple, but the superior court's certification order substituted a new apple. . . . When the superior court later certified a broader class, it increased the amount in controversy, effectively amending the complaint."). Significantly, the Ninth Circuit has not addressed whether the sort of basis proffered by defendant in support of its second removal here—that defendant's Technology Department "created multiple programs" to determine the labor-related statistics based upon information presumably readily available to defendant at the time of its first removal, Dkt. 15-2 ¶ 4— qualifies as a "new and different" ground for removal justifying a subsequent removal. The closest Ninth Circuit authority identified by either party is dictum from an unpublished decision in Garibay v. Archstone Communities LLC, 539 Fed. App'x 763 (9th Cir. 2013).

In Garibay, the Ninth Circuit recognized that "if [a defendant] later discovers evidence that the jurisdictional bar is met, it may once again attempt to remove this case to federal court." 539 Fed. App'x at 765. In support of that recognition, the panel in Garibay cited Roth v. CHA Hollywood Med. Ctr., 720 F.3d 1121 (9th Cir. 2013), which held that "a defendant who has not lost the right to remove because of a failure to timely

9

1 file a notice of removal under 28 U.S.C. § 1446(b)(1) or (b)(3) may remove to federal
2 court when it discovers, based on its own investigation, that a case is removable," id. at
3 1123, and then acknowledged that the defendant in Garibay lacked the benefit of such
4 decision. Garibay, 539 Fed. App'x at 765. These recognitions are in-line with the Ninth
5 Circuit's still earlier recognition in Abrego Abrego v. The Dow Chemical Co. 443 F.3d 676
6 (9th Cir. 2006) that "later-discovered facts may prompt a second attempt at removal." Id.
7 at 691.

All of the above authorities consider situations where a defendant ***discovers*** new information. None address the scenario where a subsequent removal is premised upon information available to, but uncited by, a defendant at the time of its prior removal. Despite the absence of any Ninth Circuit authority on this point, at least three California district courts have considered the propriety of a subsequent removal premised upon such previously available information. All have held such removal improper.

Perhaps the most often cited is Allen v. UtiliQuest, LLC, 2014 WL 94337 (N.D. Cal. Jan. 9, 2014). In that case, Judge Armstrong considered whether a human resources manager's declaration premised upon information readily available to defendant at the time of its first removal qualified as a new and different ground for defendant's subsequent removal. Id. at *3 ("[T]he 'new' factual information cited by Defendant was readily available when it filed its opposition to Plaintiff's original motion to remand. In particular, Defendant relies on the declaration of its Senior Human Resources Manager, Neil Vocke, who reviewed the company's internal time records and payroll information pertaining to Plaintiff and employees working in his position, and estimated the amount of time and wages they may be owed for time spent commuting. . . . Based on the figures provided by Mr. Vocke, defense counsel, in turn, calculated the alleged amount in controversy."). The court in Allen observed that, "in providing these estimates, Defendant simply relied on information already in its possession, as opposed to new information obtained from Plaintiff to establish that, in fact, the requisite amount was in controversy to support jurisdiction under CAFA." Id. The court found that "[t]he information now

10

proffered by Defendant could—and indeed, should—have been presented to the Court in opposing Plaintiff's first motion to remand" and then held that the defendant's "belated[] attempt[] to do so now does ***not*** render its factual showing 'new and different'" for purposes of allowing a successive removal petition." Id. (emphasis added).

Judge Bernal dealt with similar circumstances in Andersen v. Schwan Food Co., 2014 WL 1266785 (C.D. Cal. Mar. 26, 2014). In Andersen, the court considered a second removal that relied upon "declarations of Defendants' human resources personnel and on Defendants' calculations of the amounts owed to the putative class." Id. at *5. The court noted that "[l]ike the defendant in Allen, Defendants here simply rely on information already in their possession. The Initial Removal calculated the amount in controversy by extrapolating information provided in the Complaint . . . while the Second Removal bases its calculations on Defendants' payroll records." Id. The court further pointed out that defendants "have not shown that the payroll records were unavailable to them when they initially sought removal, and the facts suggest the opposite." Id. Then, citing Allen for the proposition that "the information now proffered by Defendant could—and indeed, should—have been presented to the Court in opposing Plaintiff's first motion to remand," the court in Andersen found that defendants' "successive removal is improper." Id. at *6.[1]

Again, in Gyorke-Takatri v. Nestle USA, Inc., 2016 WL 5514756 (N.D. Cal. Sept. 30, 2016), Judge Orrick considered a similar situation. In that case, the court considered whether plaintiff's post-remand acknowledgement that it would seek an alternative measure of damages (disgorgement as opposed to restitution) qualified as a new ground for removal. Id. at *3 ("Gerber asserts that, in their motion for class certification, plaintiffs

---

[1] The court in Andersen also addressed the Roth and Garibay cases that defendant relies upon. It noted that neither involved a successive removal and that "the final sentence in Garibay merely permits a second attempt at removal; it does not guarantee the propriety of such a removal." Id. at *3. The court further identified that, "despite Roth and Garibay, "defendants seeking successive removal are still subject to the general rule that where a court has previously remanded a removed action . . . successive removals are allowed only where the second notice of removal is based on newly discovered fact not available at the time of the first removal." Id. The court agrees.

11

'revealed for the first time that they do not seek restitution of the retail price they paid for Puffs, but rather seek disgorgement of Gerber's wholesale price' and that this change constitutes a new ground for removal."). The court concluded it did not. Id. It reasoned that such measure does not qualify as new evidence, in part, because "[plaintiffs] have only proposed a specific method of calculating damages based on the same allegations and facts included in their original complaint" and defendant "could have proposed this same method for calculating damages in its first removal based on the same facts alleged in the complaint." Id. Like the court in Allen and Andersen, the court in Gyorke-Takatri reiterated that despite "that it did not occur to [defendant] to offer this evidence during its first removal does not permit it to attempt a second removal now," and concluded that defendant's "second removal attempt is improper." Id.

Here, defendant fails to provide any proof that the information supporting the labor-related statistics ultimately testified to by Inlow in her declarations in support of defendant's subsequent removal was *not* available to defendant at the time of its initial December 14, 2018 removal in Southwest I. While "the complexities of using various systems to derive the data and the need to conduct quality control audits to ensure the data represented that which was intended" may have taken defendant's Technology Department "four months" to complete a system that would allow Inlow to testify to the ultimate labor-related statistics provided in support of the subsequent removal, Dkt. 15-2 ¶ 5, defendant failed to testify to anything that prevented it from pursuing that course of investigation *prior to* its first removal.

Moreover, any purported "complexities of using various systems to derive the data" aside, defendants fail to explain how the underlying information used to "derive" such "data" was itself unavailable to defendant at the time of its first removal. Despite Inlow's conclusory statements that defendant "does not maintain data showing how often its employees voluntarily traded shifts or when they were only paid straight time when they worked a double shift as the result of a shift swap . . . [or] data showing how often putative class members worked at least some overtime during the same period for which

12

1  any different premiums are earned and paid," all reasonable inferences support the
2  opposite conclusion.  Significantly, the complaint alleges claims premised upon conduct
3  that largely occurred four years prior to the action's October 24, 2018 filing.  Compl. ¶ 11
4  ("The relevant time period is defined as the time period beginning four years prior to the
5  filing of this action until judgment is entered.").  Presumably, any raw employment-related
6  information among defendant's "various business records" (Dkt. 15-2 ¶ 3) used to support
7  Inlow's conclusions for this removal—including those used to "cause an investigation"
8  into the recently testified to information, Dkt. 15-2 ¶ 2—had, for the past four years,
9  already been in defendant's possession.  Defendant fails to provide any testimony to the
10 contrary.  In short, the information now proffered by defendant "could—and indeed,
11 should—have been presented" in opposing plaintiff's first motion to remand in Southwest
12 I, and that defendant "is belatedly attempting to do so now does not render its factual
13 showing 'new and different' for purposes of allowing a successive removal petition."
14 Allen, 2014 WL 94337, at *3.

15 In line with Allen, Andersen, and Gyorke-Takatri, the court holds that defendant
16 may not subsequently remove this action based upon information that was in its
17 possession at the time of its previous removal but uncited by it in support of that removal.
18 In addition to the reasons identified by the above courts in support of their holding the
19 same, the court points out the significant prudential implication of holding otherwise—
20 namely, a defendant could file multiple successive removals premised upon only
21 incrementally different information (for myriad strategic reasons) without limit.  Because
22 defendant has failed to identify a "relevant change of circumstances" or "new and
23 different" grounds for removal distinct from those relied upon or otherwise available to it
24 in Southwest I, defendant's subsequent removal was improper.

25 One final point related to the instant motion.  In its opposition, defendant cites the
26 court's recognition at the February 2019 hearing on plaintiff's first motion to remand that it
27 could not "imagine that there is less than $5 million in controversy in a case such as this."
28 Dkt. 15 at 3, 8.  Defendant fails to note, however, that the court made that recognition in

the following context:

> "But the thing that I've seen occur on more than one occasion is that even if I remand, the defendant is able to remove again ***once a paper is produced*** establishing the amount in controversy, and I would anticipate that given that this is Southwest Airlines, that the amount in controversy is more than $5 million. . . . And so I would anticipate that this case could potentially be back here again ***after a discovery response is received that establishes that amounts*** . . ." Dkt. 15-1 Ex. F (emphasis added).

When put in context, then, the court's anticipation of a subsequent removal depended upon the identification of new information in the course of discovery—not defendant's more laborious internal investigation post-remand. Consistent with that recognition, the court notes that a litigant, including defendant here, may still seek a successive removal on the basis of newly discovered information produced by plaintiff in discovery.

## CONCLUSION

The court GRANTS plaintiff's motion to remand and REMANDS this action to the Alameda County Superior Court.

**IT IS SO ORDERED.**

Dated: December 20, 2019

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge